Filed 4/19/22  In re Alliyah F. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re ALLIYAH F. et al., Persons Coming Under the Juvenile Court Law. | B314323 (Los Angeles County Super. Ct. No. 18LJJP0313A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. GRADY F., JR., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stephanie M. Davis, Juvenile Court Referee. Conditionally reversed and remanded with directions.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

Grady F., Jr., the father of nine-year-old Alliyah F. and seven-year-old Caden F., appeals the August 12, 2021 order terminating his parental rights, contending the Los Angeles County Department of Children and Family Services (Department) failed to adequately investigate his claim of Indian ancestry and the juvenile court failed to ensure an appropriate inquiry had been conducted before concluding the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) did not apply to these proceedings.

The obligation to conduct such an investigation is clear: When there is reason to believe a child involved in a dependency proceeding is or may be an Indian child within the meaning of ICWA, the child protective agency filing the dependency petition—here, the Department—has a duty to make further inquiry regarding the possible Indian status of the child as soon as practicable.  (Welf. & Inst. Code, § 224.2, subd. (e) [duty of further inquiry if there is reason to believe an Indian child is involved];[1] Cal. Rules of Court, rule 5.481(a)(4) [duty of further inquiry if the social worker "knows or has reason to know or believe that an Indian child is or may be involved"].)

_____

[1]     Statutory references are to this code unless otherwise stated.

2

Although the existence of this duty is undisputed and its importance for protecting the rights of Indian children and Indian tribes repeatedly stated, we have too often been required to correct the Department's cramped interpretation of its proper scope. (See, e.g., *In re Y.W.* (2021) 70 Cal.App.5th 542; *In re T.G.* (2020) 58 Cal.App.5th 275; *In re Elizabeth M.* (2018) 19 Cal.App.5th 768; *In re Breanna S.* (2017) 8 Cal.App.5th 636 (*Breanna S.*), disapproved on another ground in *In re Caden C.* (2021) 11 Cal.5th 614, 637, fn. 6.) This is another such case.

After Grady advised the court he may have Blackfeet ancestry through his grandfather LeeRoy H. (the children's paternal great-grandfather), the juvenile court ordered the Department to investigate the children's possible Indian ancestry. However, other than conducting a limited interview of Grady, the Department made no effort to determine whether Alliyah and Caden may be Indian children. No one asked Grady for the names of paternal relatives other than his parents who might have pertinent information, reviewed the Department's own files from Grady's involvement with the dependency system as a minor or requested information about LeeRoy from the United States Department of Veterans Affairs despite knowing he was a veteran and buried in a national cemetery.

The Department's perfunctory nod toward its obligation to make further inquiry was wholly inadequate, as was the juvenile court's minimal oversight of that process before finding ICWA did not apply to these children. We conditionally reverse the order terminating Grady's parental rights and remand the matter for full compliance with the inquiry and notice provisions of ICWA and related California law.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *The Dependency Proceedings*

The Department filed a petition pursuant to section 300, subdivision (b)(1), on May 18, 2018 alleging that Alliyah and Caden's mother, Misty H., had a history of substance abuse and was a current user of amphetamine and marijuana and that Misty and her baby, Emma, had testified positive for amphetamine at Emma's birth. A separate subdivision (b)(1) count alleged Emma's father, Raymond B., was unwilling and unable to care for Emma. Grady, who was ultimately found to be the presumed father of Alliyah and Caden, was not named in the petition.

The juvenile court sustained the petition as to Misty, as amended by interlineation, finding her substance abuse placed the children at substantial risk of serious physical harm. At disposition the children were removed from their parents, and reunification services were ordered for Misty and Grady.[2] Grady's services, which included participation in on-demand drug testing and a parenting course, were terminated in November 2019 for lack of compliance. Misty's services were terminated two months later.

After several continuances the section 366.26 hearing was held on August 12, 2021. The court found by clear and convincing evidence the children were adoptable and found no exception to termination of parental rights applied. The court terminated Misty's and Grady's parental rights to Alliyah and Caden and transferred care, custody and control of the children to

---

[2]     A May 22, 2019 Department report indicated Grady had not had any relationship with Alliyah and Caden in three years.

the Department for adoptive planning and placement. Alliyah and Caden's current caregivers (Mr. and Ms. P.), with whom they had been placed on April 30, 2020, were identified as their prospective adoptive parents.

Grady filed a timely notice of appeal from the order terminating his parental rights.

2. *The Department's ICWA Investigation and the Juvenile Court's ICWA Findings*

At the initial detention hearing on May 21, 2018 Misty informed the court she had no Indian ancestry. Grady was not present, and the court deferred making any ICWA findings until he appeared.

Grady made his initial appearance on August 13, 2018. He completed an ICWA-20 form, Parental Notification of Indian Status, stating he may have Indian ancestry in the Blackfeet Tribe through his grandfather.[3] After reviewing Grady's form, the court asked, "Is your grandfather available to discuss this with you?" Grady responded, "He passed away." The court then inquired, "Is there anyone else in your family who has information about your possible Indian heritage?" Grady replied, "I can check. I'm not sure. Probably my mom or somebody." The court ordered the Department to investigate further the possible Indian ancestry of Grady and Misty.

---

[3] Grady wrote "Blackfoot." The Department understood this to be a reference to the federally recognized Blackfeet Tribe of the Blackfeet Indian Reservation of Montana. (See Indian Entities Recognized by and Eligible To Receive Services from the United States Bureau of Indian Affairs, 86 Fed.Reg. 7554 (Jan. 29, 2021).)

5

During the following three months the Department made a number of attempts to contact Grady, finally reaching him for a telephone interview on November 27, 2018. A November 28, 2018 last minute information for the court report stated, without additional detail, "On 11/27/18 Mr. F[.] returned AA Dickerson's phone messages and provided all known family information for ICWA purposes. Once a new hearing date has been established, AA Dickerson will mail the ICWA notices to the appropriate tribes."

The substance of the Department's interview with Grady was described in addenda to the ICWA-30 notices sent to the Blackfeet Tribe, which were attached to the Department's April 30, 2019 last minute information for the court report. According to the Department's summary of the conversation, Grady said his mother, LeeAnne H., had Blackfeet heritage. Grady told the social worker LeeAnne was homeless and did not have a phone and said he had not often seen her after he was nine years old. Grady provided some biographical information about his father, who died in October 2014. Grady had never met his father's parents or his mother's mother, but he had met his maternal grandfather, LeeRoy, on one occasion. Grady said he did not know his grandfather's dates of birth or death, but he was a veteran buried in the National Cemetery in Arvin outside of Bakersfield. Grady told the social worker "the connection to the Blackfeet tribe comes through him."

The social worker asked Grady if there were other family members that could be contacted for more information. Grady responded that "his family had disowned him and did not communicate with him and that he did not have any of their contact numbers." Rather than ask any follow-up questions (the

6

names of other family members who might have relevant information, for example), the social worker told Grady if he (Grady) obtained more information about his ancestry to notify the worker and Grady's attorney. The social worker then terminated the call.

On December 7, 2018 the Department mailed ICWA notices regarding Caden to the Blackfeet Tribe of Montana, the Bureau of Indian Affairs and the Secretary of the Interior. The notice contained only the information Grady had provided during the November 27, 2018 telephone interview, including the maternal grandmother's name (LeeAnne H.) and date and likely place of birth, but no other information, and the paternal great-grandfather's name (LeeRoy H.) and possible place of death (Bakersfield), but no other information.

The Blackfeet Tribe responded in a letter dated December 27, 2018 that Caden was not listed on the tribal rolls. The letter also stated, "As of August 30, 1962, our blood quantum requirement for enrollment is 1/4 Blackfeet blood. The above children is/are not eligible for enrollment, and the child(ren) is/are not domiciled on the Blackfeet Indian reservation." The letter, however, added, "If you are able to gather more information on the ancestry of the parents, please contact me again and I will review the tribal rolls."

Because the original notices had omitted Alliyah, the Department in April 2019 sent a second set of notices containing the same information. An identical response, dated April 24, 2019, was received from the Blackfeet Tribe. In a last minute information report for the court filed May 14, 2019 the Department submitted the response from the Blackfeet Tribe and

7

recommended that the court find ICWA did not apply to Alliyah or Caden.

At the disposition hearing for Grady on May 22, 2019, after reviewing the Department's reports, the court stated on the record it found no reason to know Alliyah and Caden are Indian children within the meaning of ICWA and checked the "no" box on the court-ordered case plan indicating ICWA did not apply. The minute orders from the May 22, 2019 hearing, however, contained no ICWA findings.

In a supplemental report for the section 366.26 selection and implementation hearing scheduled for January 12, 2021, the Department noted the missing ICWA findings and recommended the court make ICWA findings at the upcoming hearing based on the Department's April 30, 2019 and May 14, 2019 last minute information reports. The Department provided no new information regarding the children's possible Blackfeet ancestry.

The court on January 12, 2021 continued the section 366.26 hearing due to issues with notice but reiterated its finding that ICWA did not apply to Alliyah or Caden, expressly ruling, "The previous investigation with respect to Mr. F[.] was a sufficient inquiry."[4] No further ICWA findings were made at the section 366.26 hearing on August 12, 2021 at which Grady's and Misty's parental rights were terminated.

---

[4] Counsel for the Department, when requesting the court again make ICWA findings at the January 12, 2021 hearing, stated, "The F[.] father did indicate ICWA possible Blackfoot heritage. However, that was extensively investigated by the Department and is reflected in the last minute information filed on May 14, 2020 [*sic*], which indicated that the children were not ICWA eligible."

8

## DISCUSSION

### 1. *ICWA and the Duties of Inquiry and Notice*

ICWA and governing federal regulations (25 C.F.R., § 23.101 et seq. (2022)) set minimal procedural protections for state courts to follow before removing Indian children and placing them in foster care or adoptive homes.  (*In re Y.W.*, *supra*, 70 Cal.App.5th at p. 551.)[5]  The statute authorizes states to provide "'a higher standard of protection'" to Indian children, their families and their tribes than the rights provided under ICWA.  (*In re T.G., supra*, 58 Cal.App.5th at pp. 287-288; see 25 U.S.C. § 1921.)  In addition to significantly limiting state court actions concerning out-of-family placements for Indian children (see *In re T.G.*, at pp. 287-288), ICWA permits an Indian child's tribe to intervene in or, where appropriate, exercise jurisdiction over a child custody proceeding (see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8).

To ensure Indian tribes may exercise their rights in dependency proceedings as guaranteed by ICWA and related state law, investigation of a family member's belief a child may have Indian ancestry must be undertaken and notice provided to the appropriate tribes.  (§ 224.2, subd. (a) [imposing on the court and child protective services agencies "an affirmative and

---

[5]     For purposes of ICWA, an "Indian child" is an unmarried individual under age 18 who is either a member of a federally recognized Indian tribe or is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.  (See 25 U.S.C. § 1903(4) [definition of "'Indian child'"] & (8) [definition of "'Indian tribe'"]; see also Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal definitions].)

9

continuing duty to inquire whether a child . . . is or may be an Indian child"]; see *In re Charles W.* (2021) 66 Cal.App.5th 483, 489.) The duty to inquire "begins with initial contact (§ 224.2, subd. (a)) and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.*, *supra*, 58 Cal.App.5th at p. 290; see § 224.2, subds. (a)-(c).)

In addition, section 224.2, subdivision (e), imposes a duty of further inquiry regarding the possible Indian status of the child "[i]f the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine there is reason to know that the child is an Indian child." California Rules of Court, rule 5.481(a)(4) provides that further inquiry must be conducted if the social worker "knows or has reason to know or believe that an Indian child is or may be involved."[6] Further

---

[6] Because Grady challenges the finding of ICWA inapplicability underlying the order made at the section 366.26 hearing terminating his parental rights, California's ICWA-related statutes and rules of court in effect in 2021, when that hearing was held, apply in this appeal. (See *In re T.G.*, *supra*, 58 Cal.App.5th at p. 289, fn. 13 ["[t]he parties agree the [state's ICWA-related statutes] in effect in January 2020 when the section 366.26 hearings were held appl[y] to these appeals"]; *In re A.M.* (2020) 47 Cal.App.5th 303, 321 ["[s]ince Mother is appealing from the findings made at the September 6, 2019 section 366.26 hearing and not those in 2017 or 2018, the current ICWA statutes apply"]; see also *In re Isaiah W.*, *supra*, 1 Cal.5th at p. 10 ["Properly understood, Ashlee's present appeal does not seek to challenge the juvenile court's finding of ICWA's inapplicability underlying the January 2012 dispositional order. It instead seeks to challenge the juvenile court's finding of ICWA's

10

inquiry includes, "but is not limited to," interviewing, as soon as practicable, extended family members, contacting the Bureau of Indian Affairs and contacting "the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (§ 224.2, subd. (e)(2).)

If those inquiries result in reason to know the child is an Indian child, notice to the relevant tribes is required. (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3; see *In re J.S.* (2021) 62 Cal.App.5th 678, 686; *In re T.G.*, *supra*, 58 Cal.App.5th at p. 290; see also *In re Josiah T.* (2021) 71 Cal.App.5th 388, 402 ["The juvenile court has 'an affirmative and continuing duty to inquire' whether a child subject to a section 300 petition may be an Indian child. [Citations.] 'This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice'"].)

2. *The Department Failed To Conduct an Adequate Inquiry into Alliyah and Caden's Possible Indian Ancestry*

The information Grady provided concerning his maternal grandfather (the children's paternal great-grandfather) on the ICWA-20 form, confirmed during his first court appearance, triggered the Department's duty to conduct further inquiry concerning Alliyah and Caden's Indian ancestry. The Department does not contend otherwise, nor could it since the juvenile court ordered it to investigate the children's ancestry. Although a Department social worker thereafter exercised diligence in reaching out to Grady, finally interviewing him by telephone after multiple unsuccessful attempts, the Department

---

inapplicability underlying the April 2013 order terminating her parental rights"].)

made no meaningful effort to contact any of Grady's extended family members or anyone else who might reasonably be expected to have information concerning Alliyah and Caden's possible Indian status, as mandated by section 224.2, subdivision (e)(2)(A) and (C).

As discussed, when asked during the telephone interview whether there were other family members that could be contacted for more information, Grady explained his family had disowned him, he did not communicate with them and he had no contact numbers for them. There was no follow-up questioning (or, at the very least, neither the report of this telephone interview nor any of the Department's other reports to the court suggest any follow-up questions were asked)—not even whether his mother had any siblings or his maternal grandfather any other grandchildren, and, if so, their names, which would have allowed the social worker or another Department investigator to attempt to learn additional information about LeeRoy.

The Department's feeble defense of this omission is that neither Grady nor any other party provided contact information. That surely made the Department's task more difficult, but it did not justify the complete lack of effort reflected in this record. As we have repeatedly reminded the Department, "it was the social worker's duty to seek out this information, not the obligation of family members to volunteer it." (*Breanna S.*, *supra*, 8 Cal.App.5th at p. 652; accord, *In re Michael V.* (2016) 3 Cal.App.5th 225, 236 ["[i]t was not the paternal great-aunt's obligation to speak up; it was the Department's obligation to inquire"].) With the names and possibly last known addresses of children or grandchildren of LeeRoy, the Department would likely have been able to contact at least a few of these relatives

and learned additional information to include on the notices to the Blackfeet Tribe.

The Department's defense of its failure to review information from Grady's history in the dependency system is equally weak. In bold ipse dixit the Department asserts that examining its own records is not part of its duty of further inquiry, ignoring section 224.2, subdivision (e)'s express statement that the statutory listing of tasks to be undertaken must not be understood as limiting the nature of the agency's obligation to investigate. (See *In re T.G.*, *supra*, 58 Cal.App.5th at p. 295 ["it is essential to the enforcement of the court's and child protective agency's 'affirmative and continuing duty to inquire' to construe broadly the duty to make further inquiry"].) The Department then adds that Grady provided identifying information about his mother and father (the paternal grandparents), suggesting, again without explanation, that no other pertinent information would be available in Grady's dependency records. This assertion is far from true. Grady provided only his mother's name (LeeAnne H.) and the date and possible place of her birth (Bakersfield), explaining she was homeless and did have a phone (although how Grady knew this was not detailed in the Department's report). Dependency records may have confirmed her place of birth and disclosed former addresses, biographical details that must be included in an ICWA notice if known (see § 224.3, subd. (a)(5)(C)),[7] as well as

---

[7] The governing federal regulations require that ICWA notices include, if known, the names, birthdates, birthplaces and tribal enrollment information of all direct lineal ancestors of the child. (25 C.F.R. § 23.111(d)(3) (2022).) State law mandates inclusion of "[a]ll names known of the Indian child's biological

13

information that might have led to current contact information. Moreover, it is likely that information concerning other paternal relatives (for example, Grady's aunts or uncles—LeeRoy's other children), including potential contact information, would be revealed had the Department bothered to look, particularly if, as would seem probable, an ICWA inquiry was made during those earlier dependency proceedings.

Finally, and perhaps most troubling, although Grady told the social worker during the telephone interview that LeeRoy was a veteran buried at a national cemetery in Arvin, California, no effort was made to contact the United States Department of Veterans Affairs or to otherwise use that information to obtain additional details about LeeRoy that should have been included on the ICWA notice to the Blackfeet Tribe. (See *In re Y.W.*, *supra*, 70 Cal.App. 5th at p. 557 ["ICWA notice requirements are strictly construed [citation] and must include enough information for the tribe to conduct a meaningful review of its records to

parents, grandparents, and great-grandparents, or Indian custodians, including maiden, married, and former names or aliases, as well as their current and former addresses, birth dates, places of birth and death, tribal enrollment information of other direct lineal ancestors of the child, and any other identifying information, if known" (§ 224.3, subd. (a)(5)(C); see former § 224.2, subd. (a)(5)(C)). (See *In re A.M.*, *supra*, 47 Cal.App.5th at p. 317 ["'If the notice duty is triggered under ICWA, the notice to a tribe must include a wide range of information about relatives, including grandparents and great-grandparents, to enable the tribe to properly identify the children's Indian ancestry. [Citation.] Any violation of this policy requires the appellate court to vacate the offending order and remand the matter for further proceedings consistent with ICWA requirements'"].)

14

determine the child's eligibility for membership," internal quotation marks omitted].) As a result of the Department's failure to conduct any meaningful investigation after its interview with Grady, the only information provided about LeeRoy on the notices sent, other than the Blackfeet affiliation, was "Deceased, Unknown Date; Bakersfield?, California." Yet it is highly likely with only a limited Internet search the Department could have accessed publicly available Department of Veterans Affairs records maintained for individuals buried in national cemeteries, which would include LeeRoy's dates of birth and death. Undoubtedly additional data were obtainable from the Department of Veterans Affairs that may have helped the Blackfeet Tribe accurately determine whether his great-grandchildren were entitled to be members of the tribe.

For its part, the juvenile court failed to ensure the Department adequately investigated the children's Indian ancestry. After ordering the Department on August 13, 2018 to inquire further based on Grady's ICWA-20 form and statements in court, it passively accepted the Department's report of its November 27, 2018 interview as fulfilling its statutory obligations without questioning the lack of follow-up in the interview itself, let alone the Department's failure to engage in any active investigative efforts. Far more is required. (*In re K.R.* (2018) 20 Cal.App.5th 701, 709 ["the court has a responsibility to ascertain that the agency has conducted an adequate investigation and cannot simply sign off on the notices as legally adequate without doing so"]; see *In re T.G., supra,* 58 Cal.App.5th at p. 293 ["[t]he court here fulfilled its initial obligation to ask about Tamara's possible Indian ancestry; it failed, however, to ensure the Department complied with its duty of further inquiry

15

based on the responses the court had received from Tamara and Loretta S."]; *In re N.G.* (2018) 27 Cal.App.5th 474, 482.)

    3. *The Department's Blood-quantum Harmless Error Argument Is Misplaced*

Pointing out that the Blackfeet Tribe informed the Department that it has a one-quarter blood quantum requirement for enrollment with the tribe, the Department argues any errors in its ICWA inquiry or notice were harmless because "the children could have no more than one-eighth [Blackfeet] blood, at best" and, accordingly, "there is no reasonable probability that the juvenile court would have found Alliyah or Caden to be an Indian child based on the paternal family's purported affiliation with the tribe and the tribe's own enrollment requirements." The factual basis for the Department's argument is somewhat uncertain; its legal premise fundamentally flawed.

As the Department points out, on his ICWA-20 form and again in his interview with the social worker, Grady stated his Blackfeet heritage was through his maternal grandfather. From this, the Department asserts the children could be no more than one-eighth Blackfeet. During his interview, however, Grady also said his mother, LeeAnne, had Blackfeet ancestry. Perhaps that simply meant LeeAnne's father (LeeRoy) was Blackfeet, as the Department assumes. But since Grady rarely saw his mother after he was nine years old and had never met his mother's mother (LeeRoy's wife), it is possible Grady's maternal grandmother also had Blackfeet affiliation. If it had conducted a diligent investigation of Alliyah and Caden's Indian ancestry, the Department would have sought background information about this woman. At the very least, it should have determined her

16

name and included it on the ICWA notices to the Blackfeet Tribe, rather than simply stating on the form, "Unknown/Information Not Provided." Without this additional information, we cannot know (and the Blackfeet Tribe did not know) whether Alliyah and Caden may have satisfied the tribe's blood quantum requirement for enrollment.

Even if Alliyah and Caden's Blackfeet ancestry is only through LeeRoy, as the Department posits, the Department's failure to adequately investigate and the juvenile court's lack of meaningful oversight were not harmless. The Blackfeet Tribe's letter describing its blood quantum requirement concerned eligibility for enrollment in the tribe. However, section 224.2, subdivision (h)—a provision not cited in the Department's brief—states, "Information that the child is not enrolled, or is not eligible for enrollment in, the tribe is not determinative of the child's membership status unless the tribe also confirms in writing that enrollment is a prerequisite for membership under tribal law or custom." The Blackfeet Tribe provided no such written confirmation.

In addition, although apparently overlooked by the Department, we rejected an identical harmless error argument in *Breanna S.*, *supra*, 8 Cal.App.5th 636. "[T]he Indian tribe, not the juvenile court or the court of appeal, is the sole entity authorized to determine whether a child who may be an Indian child is actually a member or eligible for membership in the tribe," we explained (*id.* at p. 654), citing *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 72, fn. 21 [Indian tribe is final arbiter of its membership rights]; former section 224.3, subdivision (e)(1) [now section 224.2, subdivision (h)] ["[a] determination by an Indian tribe that a child is or is not a

17

member of or eligible for membership in that tribe . . . shall be conclusive"]; and several court of appeal decisions confirming that point. Applying that fundamental principle, we held, "[W]e are unwilling to determine in the first instance the tribe's membership eligibility requirements, particularly since we are without benefit of testimony regarding how that language has been applied by the tribe and whether exceptions have been created by tribal custom and practice. [¶] Moreover, once ICWA notice is required, as it plainly was in this case, we would be extremely reluctant under most circumstances to foreclose the tribe's prerogative to evaluate a child's membership rights without it first being provided all available information mandated by ICWA." (*Breanna S.*, at p. 655.)

That reluctance is controlling here, as it was in *Breanna S.* Even if no additional information is developed, new ICWA notices containing LeeRoy's birth and death dates should be sent to the Blackfeet Tribe. And further inquiry by the Department may well develop additional information properly included on the ICWA notices, biographical data crucial to an accurate determination by the Blackfeet Tribe of Alliyah and Caden's eligibility for tribal membership. (See *In re T.G.*, *supra*, 58 Cal.App.5th at p. 294 [determination of a child's membership status "often requires providing a tribe with extensive biographical data (that is, information about ancestors and ancestry), which is why section 224.3, subdivision (a)(5)(C), prescribes in detail the information about parents, grandparents and great-grandparents that must be included in an ICWA notice"].)[8]

---

[8] We recognize the Blackfeet Tribe's letters, in addition to explaining the blood quantum requirement for enrollment, stated

## DISPOSITION

The section 366.26 order terminating Grady's parental rights is conditionally reversed. The matter is remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.

---

Alliyah and Caden do not fall within ICWA's definition of an Indian child. That assessment is not binding. Although tribal membership is for the tribe to determine based on tribal law, once that determination is made, a child's status as an Indian child within the meaning of ICWA "is a conclusion of federal and state law." (*In re Abbigail A.* (2016) 1 Cal.5th 83, 95; see *Breanna S.*, *supra*, 8 Cal.App.5th 636, 654-655.)